Birchard, C.
J. A preliminary question necessarily arising upon the exceptions to the report of the special Master is, how far conclusive is the decision of the Company’s engineer ? In the original reference, the Master was required to adopt as conclusive, the estimate of the Company’s engineer as to the quantity and quality of the work unless fraud be shown, or mistake, or undue influence, or want of good faith, such as is the subject of relief by the ordinary principles of Chancery. From a careful consideration of the various clauses of the contract, it seems to us that both parties contemplated relying upon the engineer’s judgment and science in estimating the amount of work to be paid for, and the price also to be paid in all cases where the terms of the contract do not fix the rate of compensation.
The contract itself is drawn with less precision than most contracts for labor upon the public works of the State, which have fallen under my observation. Many, indeed most that I *396 have seen contain an agreement that the decision of the engineer final and conclusive in any dispute which may between the parties. Such was the contract between Easton and the Pennsylvania & Ohio Canal Company; 13 Ohio Rep. 81. With such a stipulation, -there would be very little room to doubt the conclusiveness of-the decision fairly made by the chosen umpire of the parties. It could not or ought not to be relieved against, upon any principle more loose than the rule given to the special Master as his guide by the Court of Common Pleas. But it is urged strongly that the terms of the engagement entered into by the respondents, do by no means bind them so rigidly. The question to be decided is one that ought to be so viewed by a Court of equity as to accomplish the intentions of the parties. They are in a Court of equity, and each seeks to stand upon his equitable rights, as they are fixed and controlled by the terms and spirit of their contract. The last claim of the second article of the agreement provides that “ in cases where the said second party may be obliged to excavate fast rock, shale rock, or hard pan, the additional compensation is to be determined by the said engineer.” This, as has been already said, does not in terms make the decision final, yet the force of the language is such as, in our estimation, to leave no doubt that the parties understood that they were both agreeing to abide his decision.
If we are right in this particular, it would follow that his opinion should be conclusive, unless susceptible of being relieved against for some of the causes specified in the order of reference. It was the duty of the Company to keep in their employ an engineer, capable, honest and free to exercise a sound, disinterested and impartial judgment in estimating the additional compensation, or, to employ the words of the contract, “to determine it.”
The engineer in the Company’s employ, after the completion of the work, estimated the entire excavation at the contract price of nine cents per cubic yard, making no additional allowance for excavating about thirty-five thousand cubic yards of a *397 hard material, which cost from twenty-five to forty cents per yard. In this the Master’s report sustains him. The great question of difficulty, in this case, arises upon this The inquiry is, was the material thus difficult of excavation the substance contemplated by the parties and designated by the term hard pan. That the parties contemplated encountering a substance difficult to be removed, which was not common earth or rock, either fast or shale, is beyond doubt, but what they meant by this word is not clear. The term is not of very common use among men of science. It is not defined in treatises upon geology, and yet is here employed to denote a substantive and component part of the earth. Many practical men, and some who possess in a good degree both practical and scientific knowledge have, been called upon to testify what is to be understood by the term. It is singular that no two of them define it exactly alike. Yet it has long been a name in popular use among farmers and well diggers to denote a hard earthy substance, composed of gravel, sand and clay, very compact, nearly impervious to water and too hard to be excavated by the spade. And, as we believe, was and has been in this State, since the Geolological Survey of the State in 1837, used to designate a hard, compact earth, generally composed of sand and pebbles, cemented by clay, or clay combined with other ingredients.
In the Geological Report to the Legislature in 1838, Mr. Briggs, Assistant Geologist, in describing the limestone region of Wood.county, says: “ Resting on the limestone is a blueish clayey stratum, in which are sometimes found pebbles of primitive and secondary rocks. At some localities, where the pebbles predominate, it assumes the character of a blue, compact hard pan, while at others it is nearly free from these coarser materials.”
Again, in Mr. Kelly’s well, in the south part of Montgomery township, Wood.county, the following arrangement of the material was observed:
*398 1. Surface loam.
2. Yellowish loamy clay, 10 feet.
3. Blue hardpan 15 do.
4.Limestone.
The same deposites are found in the Black Swamp. Their average thickness is,
1. Dark soil, 1 foot.
2. Yellowish sand, 2 feet.
3. Blue hardpan, 3 feet, resting on brownish yellow limestone. — Geological Rep. 1838, p. 115.
I cite this report not because it is believed to be scientifically accurate in its description of material, for it is supposed that the Geologist instead of adopting a scientific has employed a popular term, in the popular sense as found used by him among the people of that part of Ohio ; and because we have by Mr. Kelly’s deposition evidence of what was meant by the word hard pan, as here used by Professor Briggs. Specimen^ of the material have been produced, taken from the well mentioned by Mr. Briggs, and we have compared them ourselves with specimens of the article claimed by the respondents to be hard pan, taken from the excavation of complainants’ road. The substances are not distinguishable, the one from the other. If Briggs found hard pan in Kelly’s well, the respondents found it on the rail road. But there is a mass of evidence which tends strongly to the same point. Sundry witnesses have been called who have for a long time been employed upon roads and canals in this and other States, who have seen the material excavated from the track of complainants’ road, and who concur in stating that it is what they have known as hardpan. Specimens have been produced from the public works of New York which are proven to have acquired that name there, and which when compared with the substance of specimens taken from the road here, are substantially alike. We profess not to be accurate chemists, or scientific geologists, yet the experiments which have been made in our presence, prove to our satisfaction that the respondents clearly supposed they were stipulating for a pay *399 ment of more than nine cents per cubic yard for the excavation of this hard substance, and that their belief was that the hard pan embraced it, It would be the height of injustice turn them away with that pitiful compensation, when the actual cost of the labor was three or four times that sum. It ought not to be done unless their case is such that the injustice is unavoidable. That the laborer is worthy of his hire, is a maxim of morals too sound to be disregarded for a slight cause. Nevertheless, if the other contracting party did not understand hard pan to mean what the respondents understood from it, there may be propriety in refusing the allowance for this labor.
How is that ? For what purpose did the Rail Road Compa- > ny cause that word to be inserted ? It must have been placed there for some purpose. Their witnesses, Forrer, Kelley, and others, had never known it to be used in contracts made with the Board of Public Works. They had never known any estimate to be made for any such substance, in any of the State contracts. Those contracts contained no such clause. And most, I think all but one, say they have never seen on any of the public works or in this State, the article which they should call hard pan, and that the specimens in evidence are not such; In their definitions they do not agree with each other. They do not pretend to be guided by works on science, for it is admitted that the aid is not to be derived from books which would enable any of them to testify with certainty. No one of them could refer to a scientific work for a definition. One of them produces a specimen of the material which he calls hard pan, taken from near Zanesville. On inspection, it compares well with a substance described by Lyell as conglomerate or pudding stone, “ Rounded water-worn fragments of rock or pebble, cemented together by another mineral substance, which may be of a silicious, calcarious, or argillaceous nature.” I Lyell’s Geol. 532.
In the Natural History of New York, part 4, p. 160, under the head of “ Compositions of the Drift Deposites,” Profesr sor Mather says: “ The drift deposites are composed of frag *400 ments of all the pre-existing rocks, exposed to the action of the causes that have contributed to their transportation and deposition. They are mostly coarse, composed of blocks, boulders pebbles, gravel and sand, sometimes loose, but frequently partially aggregated by argillaceous matter that renders a pick necessary to dig it. Most of the material that is called Hard pan, in New England and New York, and marl on some parts of Long Island, is formed of blocks, boulders, pebble, gravel, sand and clay, partially cemented by the latter. The gravel beds are also cemented by carbonate of lime into a coarse sandstone and conglomerate by the action of alluvial causes.” He mentions places where this last may be seen, viz: At West Point and near the Crows’ Nest, in New York. In a note, also at Zanesville and the Narrows of the Scioto Valley, two miles from Chillicothe. We have in this note sufficient to satisfy us what name the Professor would give to the specimen produced by the witness Blickensderfer. It is taken from the very locality to which he has referred as furnishing conglomerate. The material is often mentioned by geologists as consolidated gravel. It is so treated by Prof. Hitchcock, Dr. Houghton, and Dr. Buckland, and they always mean a species of pudding stone, more or less perfectly cemented by lime or lime and other mineral substances as distinguished from a cement purely argillaceous or clayey.
But whether we have placed it under the proper geological name, or whether an experienced geologist might think it more appropriately classed as a species of Breccia, is a matter of not much moment, so far as this suit is concerned, for it is clearly stone of some sort or other, and not hard pan.
I recur to the question, what did the Company intend to include by hard pan ? If they did not use the word as used by the common people of the neighborhood, if they did not use it in the sense used in the geological survey of that section of the State, it is difficult to suppose they attached any meaning to it. There must have been a purpose in incorporating it into the contract, and yet if no such article as they now claim to be the *401 material called hard pan, was ever known on the route of their road, the query why they used the word at all is very to answer. Their proof, it seems to us, establishes too It should have stopped short of showing that there was nothing upon the road or in that part of the State that was ever called hard pan. We conclude, then, it is fair to suppose that both parties understood the contract alike, and that the engineer, in so construing the contract as to exclude any additional compensation for this excavation, was mistaken, and that equity should afford relief for the error.
It is on the ground of mistake in forming a judgment as to the true meaning of the parties that we choose mainly to place the respondents’ title to relief, in reference to this important. item. Mr. Webb may have been influenced in forming his opinion, and most likely was to some extent, by the honest opinions of others, whom he justly regarded men of sufficient science to justify him in listening to their counsels.upon a matter which he regarded as doubtful.
We do not believe he has knowingly erred, or that any one of the civil engineers, whose testimony has been taken in all this controversy, has been influenced in testifying by any motive derogatory to the character of an honest, pure minded man. They have differed, it is true, in opinion upon points about which honest and intelligent men might well disagree — upon which bias or errors of opinion formed in childhood might have influenced them beyond what they were conscious of; yet on reading their testimony and considering the general candour of their statements, we felt regret that counsel should have been betrayed by zeal for their clients on either side, into any severity of remark concerning their evidence.
As to the other items it is sufficient to say that there is nothing in the evidence sufficient to induce us to change the report of the Master. He has placed much reliance upon the estimates of the engineer in charge of the work. In all doubtful matters he should have done this. His decision ought not to be disturbed without strong evidence of its being mistaken and erroneous.