(Superior court of Cincinnati.)

General Term, Jan., 1901.

---

JACOB J. RICHARDSON v. THE CINCINNATI UNION STOCKYARD CO., a corporation, JANE CARY et al.

MARTHA P. MONTGOMERY v. THE CINCINNATI UNION STOCKYARD COMPANY, CHARLES F. BATES et al.

SARAH J. BOGEN and HOWARD BATES v. THE CINCINNATI UNION STOCKYARD COMPANY, JANE CARY and JACOB J. RICHARDSON.

---

(1.) The Statutes of Ohio sections 3140 and 4182 R. S. permitting adoption of children and designation of heirs, confer the right and power upon one to prescribe who shall be heir to himself, but they do not extend the power so that he may designate who may take the property of some one else. And this applies with special force in a case of an estate tail, where the ancestor or original grantor has expressly and positively directed to whom the property shall go, and in effect has closed the doors to every one else.

(2.) Estates tail exist and are recognized in Ohio, limited by the effect thereon of the act of 1811 (section 4200 R. S.).    This act does not change the nature of the estate in the first donee in tail from an inheritable estate to an estate for life only, but the statute comes into operation when the estate passes by the first donee in tail and reaches his issue, when the statute enlarges the estate tail in the hands of such issue into an absolute estate in fee simple.

(3.) The rule which is now settled in England, in America, and in Ohio, is that where a previous life estate or other freehold interest in property is given by a will, and upon the determination of such estate the property is directed to be divided among certain surviving persons, the persons referred to are those surviving the determination of the preceding estate, and not the persons surviving the death of the testator.

(4.) Will of Clark Bates construed.

---

DEMPSEY, J.

In April, 1853, Clark Bates, late of Hamilton county, Ohio, made and executed his last will and testament. An exact copy of this instrument, conforming precisely to the original in its words and punctuation, is as follows:

"In the name of God, Amen: I, Clark Bates of the county of Hamilton and state of Ohio, being desirous of settling my wordly affairs while I have strength and capacity so to do, do make and publish this my last will and testament.

"1st: It is my will that my funeral expenses and all my just debts be first paid out of the personal property remaining at my decease.

"2nd: I give and bequeath to my beloved wife Rachel Bates all the moneys & notes of hand not herein otherwise disposed of, of which I may die possessed, for her use & benefit, during her life and at her death the remainder if any to be divided equally amongst my children; or in case of the death of either of them before their mother's decease then their children to receive the proportion of their parent. And further I give and bequeath to my said wife the homestead, comprising the dwelling house and twenty six and fourteen hundredths acres of land upon which it stands to have and to hold to her sole use and benefit during her natural life together with all the household furniture, the carriage, a horse and a cow.

"3rd: To my three sons, Joseph Bates, William Bates and Henry M. Bates, I give and bequeath all that tract of forty acres of land lying on the west side of Mill creek in Mill creek township and which I purchased of Ichabod D. Halsey to have and to hold to them share and share alike and to their heirs and assigns forever—but in case my said three sons shall not agree in a division of the said forty acres of land, then the whole tract shall be sold and the money or proceeds thereof divided equally amongst them share and share alike.

"4th: To my son William Bates I give and devise all that piece of land lying between the tract he now lives on and a twenty acre tract which I conveyed by deed to my daughter Jane Richardson to have and to hold to him his heirs and assigns forever.

"5th: I give and bequeath to my daughter Jane Richardson and to the heirs of her body forever the homestead consisting of twenty-six acres and fourteen hundredths of an acre allready given to my wife during her natural life, but at her decease thus to be the property of my said daughter Jane; but in case of the death of the said Jane Richardson without surviving issue of her body then the said property hereby to her bequeathed at the death of my said wife shall revert back to and be equally divided amongst my surviving children share and share alike; and also at the death of my said wife the household furniture shall be the property of my daghter Jane.

"6th: To my grandson Clark Bates Montgomery I give and bequeath the sum of twelve thousand dollars as expressed and embraced in a note of hand drawn and signed by Samuel Fosdick in my favor for the said sum of twelve thousand dollars dated May ninth eighteen hundred and fifty and secured by mortgage and payable five years after date; to be delivered over and paid to my said grandson by his father (who shall hold the same in trust) so soon as he shall become twenty-one years old; when he the said Clark Bates Montgomery shall give sufficient security to my heirs or legal representatives that in the event of his dying without lawful issue of his body, the said sum of twelve thousand dollars shall revert to my children and to such of my grandchildren whose father or fathers may then be not living—the grandchildren of each father deceased to receive the same share that the father would have done."

On the 10th of June, 1854, the above will was probated. When Clark Bates made said will, and when he died, his nearest relatives were: (1) His wife, Rachel; (2) his sons, Joseph, William, Ethan S., Henry M., and Isaac, and his daughter, Jane (3) his grandson, Clark B. Montgomery, child of a daughter Mary, previously deceased.

The wife Rachel, and the sons, Joseph William, Ethan, Henry and Isaac, all are now dead.

Jane, designated in the will as Jane Richardson, was the testator's youngest child. She had, previous to the making of the will, been married to James Richardson. At the time of the making of the will she was thirty-two years of age, and her husband, Richardson, was living, but at that date she was and ever since has remained without actual lineal descendants. On the 8th day of April 1869, the said Jane Richardson and James Richardson, her husband, by proceedings duly had in the probate court of Hamilton county, adopted as their child one Jacob Jennings Richardson, the minor child, aged three

years, of Joseph S. and Louisa Richardson, and on said April 8, 1869, an order was duly entered by said court declaring that from said date said child, Jacob J. Richardson, to all legal intents and purposes is the child of said petitioners, the said Jane and James Richardson.

Subsequently to this adoption proceeding Jane Richardson became a widow, and then intermarried with one Freeman G. Cary, and again became a widow. On the 7th day of July, 1897, as Jane Cary, she being then a resident of Hamilton, Butler county, Ohio, she appeared before the probate judge of said Butler county and made declaration that she did designate and appoint the said Jacob Jennings Richardson to stand toward her in the relation of an heir at law in the event of her death, and thereupon it was ordered by the said probate court that "said Jacob Jennings Richardson should be deemed and held to stand in the same relation for all purposes to the said Jane Cary as he could if a child born in lawful wedlock; that the rules of inheritance should be the same between him, the said Jacob Jennings Richardson, and the relations by blood of the said Jane Cary as if so born, and that he should be endowed with all the rights incident to said relation as fully and completely in all respects as is provided and authorized by the laws of Ohio."

It may be well to state here that the date of these proceedings to designate Jacob J. Richardson as heir of Jane Cary is subsequent to the institution of the actions at special term the judgments in which are under review now.

Jane Cary is, of course, still alive, now nearly eighty years of age. Of the five sons of Clark Bates, Ethan S. died without issue, each of the other four left children. Sarah J. Bogen and Howard Bates were and are the only children of Henry M. Bates. Laura Johnson is one of the children of Joseph Bates. Clark B. Montgomery, the grandson, is still living, and Martha P. Montgomery is his wife.

The Cincinnati Union Stockyard Company is in possession of a part of the tract of land described in the fifth item of the will, claiming title under conveyances made to it, or to its predecessors in interest, in 1880 to 1882, from (1) Jane Cary and her husband; and (2) each of the sons of Clark Bates, or else of such sons' heirs and assigns. These conveyances transferred the respective interests of each grantor or set of grantors in this property.

In May, 1893, Clark B. Montgomery conveyed by deed directly to Martha P. Montgomery all of his interest in the property. Prior to 1880. Henry M. Bates conveyed through his brother Ethan S. to his wife Mary An all of his interest

in the premises, and on April 6, 1880, the said Mary Ann and Henry M. conveyed the same interest to James J. Faran, trustee.

There was an alleged defect in the habendum clause of this deed, which was subsequently cured by a confirming deed executed by the said Mary A. and Henry M. Bates to the Cincinnati Stock Yard Company under whom the Cincinnati Union Stock Yard Company derived title. It will be remembered that Howard Bates and Sarah J. Bogen are the children of said Mary Ann and Henry M. Bates, and they have never executed any deeds releasing any interests they may have in the property, nor has Luara V. Johnson executed any such deed.

The portion of the homestead tract described in the fifth item of the will in possession of the Cininnati Union Stock Yard Company, consists of about twelve acres in extent, and is claimed in fee simple by said company. On April 1, 1897, the Cincinnati Union Stock Yard Company filed in the special term of this court its two petitions in causes numbered respectively 48,932 and 48, 933. The petition in case No. 48,932 was directed against Clark B. Montgomery, Martha P. Montgomery his wife, Charles F. Bates, Laura Johnson, Thurston Bates, Clark Bates, Daniel Dreyfoos trustee under the will of William Bates deceased, Sarah Bogen and Howard Bates, and was an ordinary petition to quiet the title of the plaintiff in this twelve acres of land.

Clark Bates and Daniel Dreyfoos, trustee, defaulted for answer. Clark B. Montgomery and Martha P. Montgomery jointly answered, he disclaiming any interest, and she claiming a fee simple in reversion of an undivided moiety of the property, after an estate tail in Jane Cary, formerly Jane Richardson, Mrs. Montgomery's estate to ripen into possession unless Jane Cary should have issue, which latter contingency is averred to be an unlikely event.

Charles F. Bates, Laura Johnson, Thurston Bates, and Ben B. Dale, Assignee of Thurston Bates, all answered making claims similar to that of Mrs. Montgomery. Sarah J. Bogen and Hoard Bates filed a joint answer denying the fee simple estate of the stockyard company, averring that they have an interest in the property under the fifth item of Clark Bates' will, and that they are the only children of Henry M. Bates, deceased, and praying for all proper relief.

On the trial the court found the issues raised in favor of the stock yard company, and decreed that its title to said twelve acres be quieted as against the claims of all the other parties.

Motions for a new trial were filed by

Martha P. Montgomery, by Howard Bates and Sarah J. Bogen, by Laura Johnson, by Charles F. Bates, and by Ben B. Dale, Assignee, all of which motions were overruled, exceptions duly noted, and a bill of exceptions containing all of the evidence duly allowed and filed.

To the action of the court at special term Martha P. Montgomery prosecutes error, and her petition in error stands as cause No. 3240 of the general term. In this error proceeding Sarah J. Bogen, Howard Bates and Laura V. Johnson have filed a cross-petition in error No active steps appear to have been taken by any other parties to assert their claims here.

In case No. 48,933 of the special term the petition filed by the stock yard Company was directed against Jane Cary and Jacob J. Richardson. Subsequently Sarah J. Bogen and Howard Bates were made parties defendant. The petition in this case recites, among other facts, the fifth item of said Clark Bates' will; the number of children living at the time of the execution of said will; that an agreement to convey, and a deed in execution of such agreement, were made by Jane Cary and husband, conveying for $10,000.00 the twelve acres claimed in fee by the Stock Yard Company to Samuel F. Hunt, from and under whom said company derive title; that all of the children of Clark Bates except Jane Cary have deceased, and that there is not living now any child born of the body of said Jane, nor any descendant of such a child. The petition then contains averments as to the adoption of said Jacob J. Richardson, and as to a claim on the part of said Jane Cary and said Jacob J. Richardson; that the deed to Hunt conveyed only an estate for the life of Jane Cary, and that she is seized of an estate in fee tail of said premises, which upon her death would vest in said Richardson in fee simple as statutory heir of her body, with a remainder in fee simple in her, Jane Cary, dependent thereon, should she die without leaving heirs of her body. Then follow averments as to the effect and intent of the deed from Jane Cary, and a prayer that if necessary the deed be corrected and reformed to conform to the intent, and in any event that the title be quieted.

Jane Cary answered pleading the statute of limitations, and denying that either she or her husband intended to convey more than a life estate to said Samuel F. Hunt. Jacob J. Richardson filed an original and a supplemental answer and cross-petition, in which he relied for his claims upon the proceedings in adoption and in designating him as heir. The answer and cross-petition of Howard Bates and Sarah Bogen is directed to controverting certain averments in the petition, and is a denial of the averments of the answer and cross-petition of Jacob J. Richardson.

On the trial a finding of facts was made as to the issues raised between the various parties by the answers and cross-petition of Jacob J. Richardson. The court found (1) the facts of the petition to be true (2) the facts as to the adoption proceedings; (3) the facts as to the proceedings designating Jacob J. Richardson as heir; and, as conclusions of law: (1) that the claims of said Richardson based upon the adoption proceedings were invalid; (2) that his claims based upon his designation as heir at law of Jane Cary, were likewise invalid; and (3) that the stock yard company was entitled to have its title quieted against the claims of both Jane Cary and Jacob J. Richardson; to which findings of fact and conclusions of law Richardson excepted.

Upon all the other issues there was a finding generally in favor of the company, and that it was the owner of the twelve acres in fee simple. And then the judgment of the court followed quieting the title in the stockyard company, to which the usual exceptions were taken by all parties.

Motions for new trial were filed by all parties, and the same overruled and exceptions noted, and a bill of exceptions formally taken, allowed and filed.

To reverse the judgment against him Jacob J. Richardson filed his petition in error, which is docketed here as No. 3233; in this proceeding Sarah J. Bogen and Howard Bates file a cross-petition in error. The said Sarah J. Bogen and Howard Bates also file an independent petition in error to reverse the judgment against them at special term in said case No. 48,933, and this proceeding is docketed here as case No. 3241. Jane Cary does not appear to have taken any active steps to assert her claims in this court.

The above statement of facts, while somewhat tedious, is made necessary by the fact that the determination of the questions involved in each case is dependent upon the proper construction of the fifth item of said Clark Bates' will, around which as a center revolve the different contentions put forward by the various parties hereto. The cases were tried together at special term on the same evidence, and the same bill of exceptions serves in all of the cases here; hence all of the questions are to be disposed of as if tried in one case.

Save as to the facts heretofore set forth the evidence is exceedingly meager as to the situation and circumstances surrounding the testator at the time of making the will: in fact, so sparse are they that we are practically driven to the will and its language alone to determine what the testator had in mind

and intended to do when the will was made.

There are three contentions in the case. It is admitted by all parties that Jane Cary obtained an estate in fee tail to vest in possession upon the death of her mother.

On the part of Jacob J. Richardson it is contended that the findings of fact as made by the court at special term show that Jane Cary is an aged woman without natural born children, and that Jacob J. Richardson is her legally adopted child and has also been designated as her heir under the statutes of Ohio.

From these facts counsel argues that by the adoption in 1869, or the designation as heir in 1897, Jacob J. Richardson became heir in tail to Jane Cary, and thereby clothed with an interest in her property, and consequently that the court at special term erred in finding this claim untenable.

We have read with must interest and instruction to ourselves the elaborate and masterly brief of counsel for Mr. Richardson, and especially that portion of it devoted to the historical development of this branch of legislation but, we have not been able at the end to find ourselves in agreement with him as to the conclusion he reaches under our statutes.

The distinctive peculiarity of the tenancy in tail excepts it out of the operation of both statutes, sections 3140 and 4182, unless there be clear and express language in either including such estates. Such language we do not find. An estate tail is certainly an estate of inheritance, and the issue of the donee in tail "take, not as purchasers, but by descent; but this is to be understood as meaning that the issue takes the estate "as an estate of inheritance and as being of the prescribed line of issue or inheritance, and not by direct descent from his immediate ancestor; since he takes, per formam doni, from the person who first created the estate." Pollock v. Speidel, 17 Ohio St., at page 449.

The donor of the estate tail prescribes the line of issue or inheritance in which the estate shall go, and it is according to the form of his grant that the property shall pass, and not according to the whim of the grantee.

Now, while it would be perfectly reasonable to permit an individual to adopt a child or designate an heir, so as to determine with reference to prop erty that he owns or may own, the course of descent of that property, a different question is presented when we come to consider the wisdom of permitting an individual by such proceedings to change or alter, as to property in which he has a modified or limited tenancy, the course of descent lawfully prescribed for that property by the person originally creating the estate The statutes permitting adoption of children and designation of heirs confer the right and power upon one to prescribe who shall be heir to himself, but do they extend the power so that he may designate who may take the property of some one else.

Our supreme court with regard to expectancies that may be inherited through an adopter has certainly answered this question in the negative, for in Phillips v. McConica, 59 Ohio St., 1, it has been held that an adopted child is enabled by section 3140, Revised Statutes, to inherit from its adopter, but not through him from his ancestors. And at page 9 it uses this language:

"Adoption does not change the law of descent and distribution as to the property of the ancestors of the adopter. The ancestors of the adopter are presumed to know their relatives by blood and to have them in mind in the distribution of their estates, either by will or descent, but they cannot be expected to keep informed as to adoption proceedings in the probate courts of the counties of this state; and to allow an adopted child to inherit from the ancestors of the adopter would often put property into the hands of un-heard-of adopted children contrary to the wishes and expectations of such ancestors."

With how much more force do the reasons which underlie this argument, based upon presumption and implication as to an ancestor's probable wishes, apply to a case such as an estate tail, where the ancestor or original grantor has expressly and positively directed to whom the property shall go, and in effect has closed the doors to every one else.

And in Lathrop v. Young, 25 Ohio St., 451, the court in discussing both sections 3140 and 4182, as they appeared in Swan & Critchfield at pages 506 and 507, says that:

"These acts give to the adopted heir the legal status of a child of the adopter, born in lawful wedlock; and the statute requires him to be regarded as such child, in tracing descent to or from him in the cases therein specified.

"But in cases which do not come within those acts, the operation of the statute of descents is the same as if such acts had not been passed."

The logic of this decision is that these two acts are confined to cases falling strictly within their terms. We have seen that the descent of an estate tail is to be according to a course marked out by the original donor; that no particular tenant in tail is the source of title for the issue coming after him, but is rather a medium through whom according to the rule prescribed by the donor

the right of succeeding issue to take is to be ascertained; and that the real source of the title is the donor himself in whom is always left a reversion expectant on the failure of issue. Neither of the two statutes under discussion, nor the sections of the Revised Statutes corresponding to them, gives to an adopter or a designator of any heir any larger power than to adopt or designate an heir to or for himself, that is, as to property that he absolutely controls or may absolutely control himself. There is certainly nothing in either statute that gives such an adopter or designator, even by the most liberal construction, the right to change, without the consent of the donor of an estate tail or those in privity with him, the course of succession prescribed by him, and thus, without his consent, to divest him or his heirs of a vested property right.

The statutes not having provided for this kind of a case, it is our judgment that so far as the estate tail in this case is concerned the said Jacob J. Richardson will take nothing by reason of the several proceedings in adoption and to designate him as heir hereinbefore set out. We reach this conclusion on a construction of the said sections as they now exist, and we express and intend to express no opinion upon the constitutionality of legislation, (which has been touched upon by one of the counsel herein) which might seek to extend the provisions of the statutes so as to permit tenants in tail by proceedings of this kind constructively to create issue that might inherit through them.

The second contention made in this case is on behalf of Sarah J. Bogen and Howard Bates, only children of Henry M Bates and of Laura V. Johnson, one of the children of Joseph Bates. This contention is made up of two propositions and a conclusion deducted from them, and is as follows:

First, that the act of 1811, (S. & C., 550; R. S., 4200) abolishing estates tail in Ohio, must be read into the will in this case, with the result that it makes the estate created by the fifth item of the will not an estate tail under the statute de donis, but a limited or conditional fee as it existed at common law before the passage of that statute. In other words, the entire estate in fee passed by the will to Jane Richardson, leaving nothing in the testator but a possibility of reverter, and not the reversion which he would have held had the statute de donis been in force.

Second, that this possibility of reverter passed under the will by executory devise to such of the children of Clark Bates who might be living at the death of Jane Richardson; that this executory devise gave no vested interest to the children of Clark Bates who might be living at his death because it was

dependent upon two uncertain events, first that Jane Richardson should die without leaving issue, and, second, that some of the testator's children would survive that contingent event and be living to take the estate when the contingency happened.

Third, that it follows as a conclusion that if there be surviving children to take when Jane Richardson (now Jane Cary) dies, that the estate will revert to the donor and his heirs living at the time the event occurs.

Therefore no estate could descend to heirs, if possibility had not been limited over to surviving children.

We have quoted the contention of counsel literally so that there should be no mistake on our part in stating his position.

If counsel's position be correct the conveyances made by the fathers of Sarah Bogen, Howard Bates and Laura V. Johnson operated, as against their children, to convey nothing.

If the first proposition be true, the second may be conceded to be true also, and the conclusion would follow as a necessary consequence, although the writer of this opinion does not quite apprehend what counsel means by his last assertion that "Therefore, no estate could descend to heirs, if possibility had not been limited over to surviving children." Counsel, of course, is making a distinction between an estate or interest and a possibility, and argues that while a possibility might be limited over by way of executory devise and ripen into an estate, still that is not sufficient to constitute it a descendible estate that will vest in immediate heirs so as to permit of alienation. The insertion of the word "even" after the word "heirs" and before the word "if" would probably make counsel's meaning clearer. However, this is mere verbal criticism.

The gist of the question lies in counsel's first proposition and the reasons he puts forth to support it. His first reason is that an estate tail under the statute de donis never did and does not now exist in Ohio. If the question were nova res with us, it might be worthy of careful consideration. But the point was squarely made in the case of Pollock v. Speidel, supra; see synopsis of brief of Swing and Griffith, of counsel, pages 442-444; and the supreme court at page 447, passing on this point, say, quoting from Kent,

"Estates tail were introduced into this country with the other parts of the English jurisprudence, and they subsisted in full force before our revolution, subject equally to the power of being barred by a fine or common recovery;" and then further along:

"In Ohio, estates tail seem always to have been recognized, and to a certain

extent tolerated''; and at page 448, discussing the case of Carroll v. Olmstead, 16 O. R., 251, referred to by counsel:

"We do not understand the decision in that case to rest on the ground, either that we have no estates tail in Ohio, or that the entail may be barred by an ordinary conveyance in fee simple executed by the first donee.''

And the court then proceeded to hold the estate created by the deed in that case to be an estate tail, that is, such an estate as they were discussing, the technical estate tail of the English jurisprudence.

It is true that there was a laxity of precision in discussing the effect of the act of 1811, at the bottom of page 447, whereby it might seem that it was the court's opinion that said act recognized the first donee in tail as holding an estate for life only, and converting the estate into a fee simple when it reaches the hands of his issue.

But this inaccuracy of statement is explained away in Harkness v. Corning, 24 Ohio St., at page 427 and 428, by the statement that the controversy in Pollock v. Speidel was between the issue of the donee and the defendant claiming under a conveyance from the donee, the question being over the quantity of interest conveyed, and that the idea intended to be expressed by the court in Pollock v. Speidel was that the donee, holding as tenant in tail, could not convey an estate that would endure beyond his own life. And the court further adds that to give to the expression a meaning that the donee in tail took only a life estate would make the opinion in Pollock v. Speidel not only inconsistent with itself, but with the fourth proposition of the syllabus.

Harkness v. Corning was a case also that recognized the technical English estate tail as existent in Ohio.

In the light of these adjudications we are bound to say that such estates are recognized and do exist in Ohio, limited, of course, by the effect thereon of the act of 1811. And it is upon the operation and effect of this act that counsel bases his second and what is, as is apparent from his argument, his strongest reason for the first proposition hereinbefore advanced by him. The statute provides that "* * * all estates given in tail shall be and remain an absolute estate in fee simple to the issue of the first donee in tail.''

Counsel's argument is that as the issue take through the first donee, her power of transmission must be enlarged to enable her to transmit an estate in fee simple; that the estate is enlarged when it reaches the issue of the first donee by force of the statute operating upon the will which broadens the meaning of the language and makes it sufficient to convey to the first taker the fee, with power to convey a fee simple to her issue, instead of the power limited by the statute de donis to transmit an estate for the life of the issue with power in such issue to transmit an indefinite succession of life estates terminable only upon failure of the line. The fallacy in this argument lies in the assumption that the act of 1811 operates at all upon, or in any way affects, the estate of the first donee in tail.

Harkness v. Corning, supra, is decisive of that point, for in that case it was held that the statute does not change the nature of the estate in the first donee in tail from an inheritable estate to an estate for life only, and, in the opinion of the court sustaining that conclusion they call special attention to numerous cases in Connecticut, from which state Ohio borrowed the act of 1811, in which cases it was uniformly held that the estate of the first donee was an estate in tail, unaffected by the statute. The statute does not come into operation until the estate passes by the first donee in tail and reaches the issue of such donee when, as said in Harkness v. Corning at page 326, on the determination of the interest of such donee and of such rights as the law annexed to his interest while held by him, the statute then enlarges the estate tail in the hands of such issue into an absolute estate in fee simple. Mark, the supreme court still entitles the estate created by the donum of the ancestor as an estate tail in the issue; upon this estate tail the statute operates and converts it into a fee simple, not as claimed by counsel by enlarging the estate of the first donee, but by withdrawing from the donor and his heirs the reversion still extant in them dependent upon the termination of the estate in the first donee, annexing it to the estate tail in the issue, and making an absolute fee simple of that estate.

We see no escape from the reasoning in Pollock v. Speidel and Harkness v. Corning, and it is therefore our judgment that the specific claims put forward by Sarah Bogen, Howard Bates and Laura V. Johnson are not valid, and that the court, at special term, in rejecting them did not err.

The third contention in this case, the one most difficult of solution and the most serious in results, is the one that arises between the stock yard company and Martha P. Montgomery over the true interpretation and construction of the much referred to fifth item of said Clark Bates' will. This item reads as follows:

"I give and bequeath to my daughter Jane Richardson and to the heirs of her body forever the homestead consisting of twenty-six acres and fourteen hundredths of an acre already given to my

wife during her natural life but at her decease thus to be the property of my said daughter Jane; but in case of the death of the said Jane Richardson without surviving issue of herbody then the said property hereby to her bequeathed at the death of my said wife shall revert back to and be equally divided amongst my surviving children share and share alike; and also at the death of my said wife the household furniture shall be the property of my daughter Jane.''

The foregoing copy is an exact literal transcript of said item fifth as it appears in the original will.

On the part of the stock yard company it is claimed that by the terms of this item an estate tail, in remainder to the life estate of the wife was created in Jane, with a vested remainder over, the event of Jane's dying without surviving issue, to all of the children of testator who survived him. On the part of Mrs. Montgomery it is admitted, of course, that Jane took an estate tail to vest in possession at the death of her mother, but it is contended that the remainder over after Jane's death without surviving issue, is a contingent one, and that the estate is limited to such of the children of testator as may be living at the death of Jane.

The controversy between these two parties has turned and has been elaborately argued on the claims as above set forth, and related solely to the interpretation to be put upon the phrase "my surviving children". In the argument of one of counsel, Judge Worthington, a suggestion was thrown out that on a cursory reading of this item a third interpretation might seem plausible by which it would appear that the testator when he provided for this devise over in the contingency of Jane's death without issue had restricted his contemplation of the occurrence of that event to a period antecedent to his own death, or, at the furtherest, prior to the death of his wife.

Counsel combats this third interpretation very strenuously. It has been exceedingly difficult to deduce from the whole will itself any scheme of devise or devolution of estate on testator's part which will harmonize in all its details. So far as those naturally entitled to expect something from his bounty are concerned, there is apparent at once an absolute inequality of distribution, for two of his children are left entirely out of the will, although one of these two was made executor. How far this inequality may be seeming and not real, we are unable to say from the evidence, although the will itself shows that Jane did receive something from testator in his lifetime, and there is some evidence tending to show a like dealing with all of the other children.

Then so far as the nature of the interests or estates conferred is concerned, there is a discrimination; the sons who were remembered take absolute interests; the living daughter and the child of the dead daughter are given but limited or restricted interests. And so, also, when it comes to providing for substitution or representation in case of death. Under the second item of the will, with regard to the personalty left after the wifes' death, all of the children—or in case of the death of any of them, then the children of the deceased child take, while in the devise in case of Montgomery's death without issue, all of the children. if living, take, but in case of the death of any of them, then only the children of deceased fathers are permitted to take their father's share, thus impliedly excluding any child or children of Jane from standing in her stead were she dead at that time and leaving children.

Two points, however, do stand out prominently in this will. One is, as is evident from both items fifth and sixth, that the testator endeavored as far as possible to him to prevent the husbands and the relatives of the husbands of his daughters from obtaining any immediate benefit from his estate under his will.

The other point is this: In the second and sixth items of the will are contained bequests to take effect in future, in the one case on the natural termination of the wife's estate. and in the other case on the termination of Montgomery's estate by the happening of the contingency provided for; and in both of these cases the testator has marked out definitely and with certainty whom he wishes to be his beneficiaries. In other words, both of these items bear witness to the fact that the testator had in mind the identical persons he wished to take, and looking to the chances that doubt might be created by reason of the death of one or more of them, testator took the necessary steps to remove that doubt.

The beneficiaries of the immediate bequests—that is, the mother, the sons, the daughter and the grandson—are all exact and certain. The one remaining gift left is the devise over "to my surviving children", and that, it is contended, is uncertain and contingent and dependent upon the death of Jane.

I am unable to accede to this view; I do not think it is reasonable to make this devise an exception to the rule of certainty as to beneficiaries evidenced by every other item and clause of this will. The testator had in his mind the people he intended should have this property under item fifth, and these people in his mind were definite and ascertained.

The only point of time at which it is

possible to give certainty to the bene-
ficiaries is the period of the testator's
death, for it is reasonable to suppose
that he contemplated that most, and
probably all, of his children would sur-
vive him. This conclusion would, of
course, ordinarily embrace Jane as one
of those children; but in this will it is
Jane's death without issue that the
testator has in mind as the contingency
on which "my surviving children" are
to take; so that the period of her death,
as it might chance to happen, so far as
testator had it in contemplation, is an-
other factor that must be considered.

Now, the testator had given to Jane
an estate tail; had marked out for her
expressly the interest he had intended
her to take. Now, if we give to the
provision "In case of the death of the
said Jane Richardson without surviv-
ing issue of her body" its usual and or-
dinary meaning of death at any time
before or after the testator's death, and
Jane—as is the fact—should outlive the
testator, then we have this result that,
in addition to her estate tail, Jane
would have a vested remainder in a
moiety of the estate, to be disposed of
at her pleasure, but which never could
come to the enjoyment of herself or
assigns until the happening of the con-
tingency provided for, that is, her death
without issue; and thus the very event
that the testator is providing against is
the very event that will cause to ripen
into possession in her or her assigns
another and different vested estate.

This, it strikes me, is altogether an-
tagonistic to the testator's intention.
The very fact that he limited this prop-
erty to her and her issue is the strong-
est evidence to my mind that the estate
created thereby was the only estate she
was to have.

It is perfectly absurd to say that he
intended her to have a technical estate
tail which was to continue such pro-
vided she had issue, but if she died
without issue then her estate tail was
to be enlarged to a fee, but she was to
be cut down in amount to an one-sixth.

Such a circumlocutory process as this
was never contemplated by this testa-
tor.

The only reasonable exposition of this
provision is that the testator, for some
reason or other that is not made mani-
fest to us, contemplated that Jane
might die before he did, and he made
provision for that contingency, and
then provided that his surviving child-
ren, who would in all likelihood be the
sons, should take the property devised
to her. It seems to me that if the lan-
guage of this item be taken and read
ordinarily and naturally, no other con-
clusion can be arrived at.

It is argued that on a grammatical an-
alysis of the sentence "then the said
property hereby to her bequeathed at
the death of my said wife shall revert
back", etc., the phrase "at the death
of my said wife" is but an adverbial
modifier of the participle "be-
queathed",and that the object of its use
was to describe with certainty the prop-
erty intended to be devised. It is further
argued that to separate the phrsae and
its participle would be but to distort
the sentence.

This argument has not appealed to me
very strongly, for the reasons that scan
the will as closely as one may, we find
such a scarcity of punctuation marks
that their absence or presence does not
reflect much light upon the testator's
intention. We find used, however, in
four different places in this will the
phrase "at the death of my said wife",
or some such similar phrase. In the
second item it appears as "at her
death", referring to his wife, and it
marks there the period of distribution
for the personalty depending upon her
life estate. In the first clause of the
fifth item the expression is "at her de-
cease", and it is used to denote the
point of time at which Jane is to come
into possession of her estate tail. In
the last clause of the fifth item, a clause
separated from the preceding clauses
by only a semi colon, we find used this
form, "at the death of my said wife"
and used to designate the period at
which Jane is to come into possession
of the household furniture. Now in
these three clauses the phrase is ex-
pressly used to denote the point of time
when interests are to vest in possession,
technically called the period of distri-
bution. In the fifth item, and interme-
diate between the clause giving the
estate tail to Jane and the clause giving
her the household furniture, comes this
clause giving over the property in case
of the death of Jane without issue, and
in which clause is again used this
phrase "at the death of my said wife".
In all other places he has used this
phrase as marking the period of distri-
bution or coming into possession; the
presumption that he used the phrase in
the same sense in the clause in ques-
tion is too strong to my mind to be over-
come by the arguments used, and what
is more, is in accordance with the set-
tled rules of construction.

So the argument as to the use and
effect of the word "then" as an adverb
of time referring to Jane's death with-
out issue and fixing that as the period
of distribution, is not warranted by the
context. The phrase "in case of the
death of the said Jane Richardson
without surviving issue of her body" is
an adverbial phrase which truly modi-
fies the verbs "revert back" and "be
divided", and its strictly natural and
grammatical place in the sentence
would be subsequent to these verbs.

The phrase, however, by usage was

transposed **to** the beginning of the sentence, and the conditional conjunction "then" was used referring back to the thought concealed in the phrase and preserving the smoothness of the sentence

It seems to me it would be useless to attempt to argue the case along grammatical or rhetorical lines, for if we but resort to a little common sense punctuation, the intent of the testator is made clear. If a comma be inserted between the words "bequeathed" and "at", then the sentence will read "then the said property hereby to her bequeathed, at the death of my said wife shall revert back to and be equally divided amongst my surviving children share and share alike." So punctuated, the sentence becomes harmonious with the rest of the will as to certainty of beneficiaries and as to a period of distribution.

So punctuated, it gives force and effect and attaches a meaning, without tautology, to every word and phrase and clause in the whole item. The words "then", "hereby bequeathed" and "at the death of my said wife" all take on natural and ordinary meanings without that straining of the sense required by other constructions. Even the little word "but", the adversative conjunction which introduces the sentence, takes on its proper signification of opposition combined with transition, and shows the contrast between the estate previously given to Jane, the one substituted for it, and the idea implied of one passing into the other. So, the word "revert", or "revert back" in its true sense of "coming away" or "returning" has full force given to it, for it is as appropriate to the estate returning after the expiration of the wife's life estate as it is to the falling in of the reversion after the estate tail. So far as language is concerned, it strikes me that punctuated as I suggest, the item is complete.

So punctuated, item fifth shows the testator's intention to have been to give Jane an estate tail in this property, should she survive him, but in case she died before he did, then at the death of the mother this property was to return to those children who did survive him.

The only argument of force against this construction is that it makes the testator die intestate as to the reversion dependent upon the estate tail, and much stress is laid upon the two rules that intestacies are not favored, and that such a construction must be had as will not produce an intestacy. The first is but a rule of presumption, and like all such rules must yield to the fact. The second rule is founded upon the first, and is to be resorted to only in cases of doubt. Where the intent is clear or can be made clear, both of these rules yield to the great rule that the intent of the testator must prevail; for while intestacies may not be favored, still we have not yet reached the point where it is permitted to the courts to make wills for decedents.

In the view that I take of this will it follows that Jane Richardson surviving her father, took a vested remainder in tail expectant on her mother's life estate, and that there was a reversion undisposed of; that is, Clark Bates died intestate as to this reversion, which, consequently, descended to his heirs at law, of whom Clark B. Montgomery in representation of his mother was one. Clark B. Montgomery's interest would be an undivided one seventh; this passed by his conveyance to his wife, and she was entitled to a finding and an adjudication settling her right and title to said one undivided seventh.

The action of the court at special term was, therefore, erroneous as to Mrs. Montgomery.

The result reached by me is identical with the result reached by my brethren of the general term, although they reach their conclusion as to the testator's intention by a different construction of said item fifth. By their construction such children of the testator as would survive Jane take the property on her death without issue. There will be no such children in existence at that time, hence, the remainder over will fail and the reversion will remain where it now is and has been since testator's death, that is, in his heirs, of whom Clark M. Montgomery is one. The judgment of this court, therefore, in regard to the action of the special term will be harmonious, although reached by different roads.

In case No. 3233, Jacob J. Richardson's case, the judgment of this court on both the petition and cross-petition in error will be in affirmance of the judgment of the court a special term.

In case No. 3241 the independent action of Sarah J. Bogen and Howard Bates, the judgment of this court will be in affirmance of the court at special term.

In case No. 3240, Martha P. Montgomery's case, inasmuch as the facts are all admitted, it is my judgment that the case ought not to be sent back, but that this court should render the judgment that ought to have been rendered at special term. This will consist in modifying the judgment at special term so as to grant the relief prayed by the stock yard company against all of the defendants below except Martha P. Montgomery, and as to her making such a finding of facts as will conform to the conclusion herein reached, and a decree and order thereon protecting and sustaining the interest and estate thus found to be in her.

Wm. Worthington, H. D. Peck, D. F. Cash; Follett & Kelly, for Stock Yard Company.

Israel Williams, F. F. Oldham, for Jacob J Richardson.

Chas. W. Baker, John C. Healy, for Sarah J. Bogen, Howard Bates and Laura V. Johnson.

Ben. B. Dale, for Thurston Bates and Assignee.

Edward Colston, for Martha P. Montgomery.

---

(Superior Court of Cincinnati.)
General Term, Jan., 1901.
SMITH, J.

I agree with the preceding opinion for the reasons stated therein that Jacob J. Richardson is not to be regarded as an issue of the body of Jane Richardson, and that Sarah J. Bogen, Howard Bates and Laura V. Johnson are not entitled to any interest in the property involved in this case, upon the theory that the estate devised to Jane Richardson is not an estate tail, but a limited or conditional fee as it existed at common law before the passage of the statute de donis.

I also agree with the preceding opinion that Sarah J. Bogen Howard Bates and Laura V. Johnson are not entitled to any interest in said property, and that Martha P. Montgomery, to whom the interest of Clark B. Montgomery has been conveyed, is entitled to a one-seventh interest in said property; but I do not agree with the opinion in the construction of the will by which such results are reached. This construction was not contended for by any of the numerous counsel in the case, and it does not seem to me to express the intention of the testator.

I agree with the foregoing opinion in is statement that it is impossible "to deduce from the whole will itself any scheme of devise or devolution of estate on testator's part which will harmonize in all its details" So far as the will itself and the surrounding circumstances show there is an inequality of distribution, and any construction which attempts to read the language on the will so that there may be equality of distribution is a forced and unnatural construction, and therefore unsound.

The interest of Clark B. Montgomery or Martha P. Montgomery, to whom his interest has been transferred, depends upon the construction of the clause "shall revert back to and be equally divided amongst my surviving children share and share alike" found in the latter part of item 5th of the will. It is contended by the Cincinnati Union Stock Yards Company that the words "my surviving children" refer to children surviving the testator, all of whom transferred their interest to the Cincinnati Union Stock Yards Company; and it is contended by the transferee of Clark B. Montgomery that the words "my surviving children" refer to children surviving Jane Richardson, and that as no children of the testator can survive Jane Richardson, all of them being now dead, the testator has died intestate as to the property referred to in item 5th, which after the death of Jane Richardson will descend to the heirs of the testator, and that a one-seventh interest in such property will thus pass to Clark B. Montgomery.

I base my opinion that the true construction of these words "my surviving children' is that they refer to children surviving Jane Richardson upon two grounds: (1) The internal evidence afforded by the will itself; and (2) the settled rule of construction now prevailing in England and in Ohio by which the words "my surviving children" when used to designate persons to whom an inheritance is to pass or distribution to be made after a life estate, are held to refer to children surviving the life tenant. unless a contrary intention appears in the will.

As to the internal evidence in the will—

In the second item he bequeathes to his wife all the money and notes on hand that he may die possessed of during her life, and if any remain upon her death, to be divided equally among his children. But having in mind that one or more of such children may be dead at the death of the mother, he makes provision for such contingency as follows: "In case of the death of either of them before their mother's decease, then their children to receive the proportion of their parent."

And in the 6th item of the will after bequeathing twelve thousand dollars to his grandson, Clark B. Montgomery, he declares that in the event of his (Montgomery) dying without issue of his body, the money shall revert to the children of the testator. Then having in mind that one or more of these children of the testator may be dead at the time of the death of Montgomery, he makes provision for such contingency in the following language: "And to such of my grandchildren whose father or fathers may not be living, the grandchildren of each father deceased to receive the same share that the father would have done." Yet, notwithstanding the evidence which the second and sixth items afford as to the intention of the testator when he makes a bequest to his children to provide for the contingency of the death of any child before the period of enjoyment is reached, the contention is that when he uses the words "my surviving children" in the fifth item and makes no provision as to who shall succeed to the interest of any

child in case such child die before Jane Richardson, that he is referring to the same children that he is referring to in his second and sixth items, viz: children surviving him. If so, why was he so careful to provide in the second and sixth items for the successors in interest to the children, and yet in the fifth item which is between these two items makes no provision whatever as to the successors? The only explanation satisfactory to my mind is that he is not referring to the same children. In the second and sixth items he is referring to the children surviving him, while in the fifth item he is referring to the children surviving Jane Richardson. Those children, and no other persons, he wishes to succeed to the estate, and therefore he makes no provision for any other persons. He designates those who are to succeed to the estate by the language most natural and suitable, viz.: "my surviving children."

The contruction that the words "my surviving children" refer to children surviving Jane Richardson, and not to children surviving the testator, avoids a peculiar, if not to say absurd result which follows from the latter construction; for if the words designate children surviving the testator, they include Jane Richardson who survived him, and thus we have the intention of the testator to be that upon the termination of the estate tail of Jane Richardson by her death without surviving issue she was given by the will a one sixth interest in fee simple in the same land. In other words, by her death without surviving issue, her interest in the property is by the will made to cease as to five-sixths, and to increase as to one-sixth from an estate tail to an estate in fee. But if it had been the intention of the testator to accomplish such an involved purpose, it would seem that he would have made his intention clear, and not left it doubtful, for he would have foreseen that it would not be likely to be presumed that such was his intention.

Furthermore, the particularity with which he describes the estate which he gives to Jane Richardson, limiting it to her and the issue of her body, is the very strongest evidence that he did not intend she should have any other interest than that described. If, too, we consider the circumstance that the testator was eighty years of age. and that his children were all very much younger than he was, it is but natural to suppose that he contemplated their surviving him; and under such circumstances the ordinary and natural way for the testator to describe his children would be by the words "my children"; to use the words "my surviving children" woud be to use a word that was superfluous. But on the other hand if he were speaking of those of his children who were to survive a certain event, he would speak of them as "my surviving children." Moreover, Jane Richardson was the youngest of his children. It was altogether probable, therefore, that one or more at least of his other children who were living at his decease would die before Jane Richardson. If then he had intended the successors of such deceased children to take their shares, he would have made provision to that effect as in the second and sixth items. As he makes no such provision, it is fair to infer he is not referring in the fifth item to the same children he is referring to in the second and sixth. It has been urged too that as the testator had six children living and one dead (Mrs. Montgomery), he used the words "my surviving children" to designate the six who were living as distinguished from the one who was dead, and by such designation described those who survived him. But the answer to this contention is that he refers in both the second and sixth items to the same children and designates them as "my children", whereas if the contention referred to is correct in all probability he would have referred to them as "my surviving children", for it is altogether improbable that in the same will he would refer to the same children as "my children" and "my surviving children."

In the preceding opinion controlling effect is given to two main purposes which it is thought the testator had in mind. First, that the husbands and relatives of the husbands of his daughters should not obtain any immediate benefit from his will; and, second, that the beneficiaries should be definitely marked out in the will as indicating the identical persons the testator had in mind.

As to the first purpose: If it be true that the testator had such a purpose in mind, the construction contended for by Clark B. Montgomery is no more in conflict with this purpose than that contended for by the stock yards company and all the other defendants in error. This is admitted by the preceding opinion, and therefore a different construction from that contended for by either plaintiff or defendants in error is thought to be the true one. But if this purpose were a controlling one in the mind of the testator, we would find it carried out in all parts of the will, which is not the case. Why should he be so anxious to prevent the husband of Jane Richardson. who was his only surviving daughter, from being an immediate beneficiary, and yet so draw the will that he might become an ultimate beneficiary. That the latter result might happen is seen in the second item in which it is provided that after

the death of his wife his money shall be divided among his children. If Jane Richardson were alive at the death of his wife, she became the absolute owner of one-sixth of his money, and if then Jane Richardson had children and made no will, it would pass in part from her by descent to her husband, or if she made a will bequeathing it to him, it would pass entire to the husband; or if she had no children and died intestate it would take the same course.

As to the second purpose: That it was the intention of the testator to mark out the identical persons who were to receive his estate; it seems to me a begging of the question to say that because he has identified the persons in the other items of the will who are to take under it, therefore the words "my surviving children" mean children surviving him. That is the very question at issue. Furthermore, I cannot see that there is always an identification in the other parts of the will of those who are to take under it, which is any more definite than the identification which follows, when the words "my surviving children" are construed to refer to the period of the death of Jane Richardson; for the identification in many instances is by the description of the persons who are to take as a class, as in the second item where, after the death of the wife of the testator, the money bequeathed goes to his children, but if any child has died before the mother, then the children of such deceased child are to receive the share which would have gone to the parent, and in the sixth item is a bequest quite similar in character. Who the identical persons will be in any class, of course, the testator does not know.

In conclusion, the construction relied upon in the preceding opinion seems to me forced and unnatural. The view I take of the proper construction of this item with respect to the question whether the estate tail devised to Jane Richardson is to continue until she shall die without issue whenever that event shall happen, or is only to continue during the life of the wife of the testator, is clearly stated by counsel for the Cincinnati Union Stock Yards Company in his brief, as follows:

"The fifth item of the will, having referred to an immediate estate for life given to the testator's widow by item 2, and having given an estate tail in remainder to his daughter Jane Richardson, describes the event upon which the gift over depends, as follows:

"But in case of the death of the said Jane Richardson without surviving issue of her body then the said property hereby to her bequeathed at the death of my said wife shall revert back to and be equally divided amongst 'other beneficiaries.'"

The words "in case of the death of said Jane Richardson without surviving issue of her body", mean simply upon the determination of the estate tail given to Jane. If she leave issue that estate continues, and is enlarged in the issue to a fee simple; but if she leaves no issue surviving her, that estate has run its course at her death, and is then determined. And as the property is then to revert and be divided, etc., the event upon which the devise over becomes effective is the determination of the estate tail by the failure of issue of Jane, whenever that failure occurs.

The certainty of this conclusion is not affected by the appearance of the words "at the death of my said wife" after the word "bequeathed." The former words modify the latter, and merely indicate the time when she was to come into possession of the property; they do not reach back and alter the time when the gift over is to become effective as previously fixed by the word "then" following the reference to the extinction of Jane's issue. To give them that latter effect would contort the sentence, and practically obliterate the word "then" from the will. This construction, too, would result in a partial intestacy, if Jane, who was then childless, should die so, unless, as was extremely improbable, her mother should survive her.

Having considered the internal evidence which the will itself affords that the true construction of the words "my surviving children" is, that the children referred to are those surviving the tenant in tail, Jane Richardson, and not those surviving the testator, and that the event upon which said estate tail terminates is the death of Jane Richardson without issue of her body at any time, I come next to consider the settled rule of construction which refers the words "my surviving children" to the death of Jane Richardson instead of the death of the testator, unless a contrary intention clearly appears from the will, which we have found it does not.

The authorities which are referred to hereafter will show that the rule which is now settled in England, in America, and in Ohio, is that where a previous life estate or other freehold interest in property is given by a will, and upon the determination of such estate the property is directed to be divided among certain surviving persons, the persons referred to are those surviving the determination of the preceding estate and not the persons surviving the death of the testator. The leading case on the subject is Cripps v. Wolcott, 4, Maddock, 11, decided in 1818 by Sir John Leach, M. R. In that case the devise created a life estate in real and

personal property and directed that after the decease of the life tenant the property should be equally divided between the two sons and the daughter of testatrix and the "survivor or survivors of them share and share alike." One son died in the lifetime of the tenant. It is held that the other son and daughter as survivors of the life tenant were entitled to the whole estate. The court said:

"It would be difficult to reconcile every case upon this subject. I consider it, however, to be settled, that if a legacy be given to two or more, equally to be divided between them or the survivors or survivor of them, and there be no special intent to be found in the will, that the survivorship is to be referred to the period of division.

If there be no previous interest given in the legacy, then the period of division is the death of the testator, and the survivors at his death will take the whole legacy. This was the case of Stringer v. Phillips.

But if a previous life estate be given, then the period of division is the death of the tenant for life, and the survivors at said death, will take the whole legacy. This is the principle of the cited cases of Russell v. Long, Daniell v. Daniell, and Jenour v. Jenour.

In Bindon v. Lord Suffolk, the House of Lords found a special intent in the will, that the division should be suspended until the debts were recovered from the crown; and they referred the survivorship to that period. The two cases of Roebuck v. Dean, and Perry v. Woods, before Lord Rosslyn, do not square with the other authorities.

Here there being no special intent to be found in the will, the terms of survivorship are to be referred to the death of the husband, who took a previous life estate."

In Drakeford v. Drakeford, 33 Beavan, 43 (1862) Lord Romily said:

"I strongly approve of the principle of the case of Cripps v. Wolcott. It is now settled law, and has never been overruled."

The case of Wordsworth v. Wood, 1 House of Lords, cases 129, was decided three times, first in 2 Beavan, 25, by Lord Langdale; again in 4 Mylne & Craig, 641, by Lord Chancellor Cottenham, and finally in the House of Lords. In each decision it was held that the words "surviving children" meant only those who survived the life tenant. In the course of his opinion in the House of Lords, Lord Brougham said:

"Then I think upon all principles—not only the principles uniformly adopted in such cases, not only the principles upon which the courts have always proceeded in dealing with such questions, but upon the plain principles of common sense—the last construction you are to come to when considering what a testator meant when he talked of surviving persons, of surviving children, or of other surviving parties; the last construction which you adopt, and which you only come to when there is something that drives you to it in the words, is that he meant the survivorship to refer to the period of his own decease, because every gift to a legatee, whether a child or other person, assumes, ex vi termini, that the party to take is a party surviving the giver of the gift, the testator. If in my will I give a legacy to A. B., I need not say 'at my decease,' because it is of course that my will is to operate only at my decease; otherwise it would be a gift inter vivos. I need not say when I give to A. B. 'I give to A. B. in case he survives,' that is assumed, because my will is to speak at the time of my decease. * * * If therefore I mean that A. B. is to take in case he survives me, which no doubt I do mean, I assume that he is to survive me, and accordingly in all the cases the presumption is that when 'surviving' is mentioned, the surviving the testator is not the kind of survivorship which is meant, unless it is clearly shown that the testator did so mean, and that he used words which were totally superfluous."

Otherwise in talking of survivorship he must mean some survivorship after another person than himself, or some survivorship relating to another period of time than his own decease.

"The case of Cripps v. Wolcott was referred to, which has never been overruled, which has never been materially doubted, though, indeed, there is found one decision of the same learned judge, that is incompatible with it. The contradictory decision was overruled, and it was overruled very mainly upon the ground of its being totally at variance not only with all the other cases, but with Cripps v. Wolcott. * * * I therefore take it to be clear, that we are not, without the most plain and manifest necessity, to be driven to consider that the testator, when he uses the words 'surviving children' means children surviving himself."

Lord Campbell and Lord Cottenham concurred, and the appeal was dismissed."

In Howard v. Collins, Law Rep., 5 Eq. p., 349, the devise was as follows:

"I give to my wife all that messuage and premises wherein I now reside, and also all my real estate. Also I appoint my wife executrix. I also, at the decease of my wife, give and devise all the aforesaid premises unto Ann my daughter; upon her decease my executors to have full power to make sale of the same and divide the produce equal-

ly between my surviving brothers and sisters and those of my wife."

It happened that all of the brothers and sisters mentioned died before the death of the life tenant. So that the provision of the will directing a division to be made between "my surviving brothers and sisters and those of my wife" never took effect. In other words, it failed for want of an object. The contest was between the heirs at law and the issue of the brothers and sisters of the testator, and the heirs at law prevailed.

Lord Romilly, M. R. said: "I am of opinion that the cases on this subject are conclusive, and that the word 'surviving' in this will means persons who should survive the last living tenant for life. It makes a little confusion to say—those who survive the survivor of the tenants for life, but in fact that is what it amounts to. The testator in this case gives the first estate for life to his wife, and then after her death he gives the estate for life to his daughter, expecting, reasonably enough, that his daughter would survive his wife, and then he gives the whole of the property in these words; 'to my surviving brothers and sisters and those of my wife.' I have been hesitating a little upon the words 'my surviving brothers and sisters', but I am clear they cannot mean, particularly as the brothers and sisters of the wife are included, the persons who survive the testator."

And after distinguishing the case from Drakeford v. Drakeford, 33 Beavan, 43, he continues:

"Here the words must mean those who survived the last living tenant for life. The testator evidently assumed that the estate for life of his daughter would follow the estate for life of his wife. I am of opinion, therefore, that the case is covered by the authorities, and that the persons intended to take were those who should survive the widow of the testator. She, unfortunately, survived the whole class; the consequence is' that there is an intestacy, and the demurrer must be allowed."

See also Marriott v. Abell, 7 Law Rep. Eq. Cases, 478, 482; Gregson's Trust Estate, 2 De G. & J. & S., 436, 438.

I direct attention next to a number of leading American authorities upon the same subject.

In Olney v. Hull, 21 Pick., 311: "A testator, after devising to his wife real estate during widowhood, proceeded as follows: "Should my wife marry or die, the land then shall be equally divided among my surviving sons, with each son paying sixty dollars to my daughters, to be equally divided among them, as soon as each son may come in possession of said land." It was held that the remainder given to the sons was contingent until the marriage or death of the widow of the testator, and that upon her death the estate vested in a son who was then living, to the exclusion of the heirs of another son who died before the widow but after the death of the testator. At p. 314 the court said:

"Had the testator intended to give to the sons who were alive at his own death, he would have said, 'my sons who survive me, or whom I may leave, or who shall be alive at my decease.' Or, if he had given to his sons generally, the effect would have been the same. It would be more plausible to suppose, that he meant all the sons surviving the making of the will; but this would be an unnatural construction."

"In Coveny v. McLaughlin, 148 Mass., 576: The testator devised his dwelling house to his wife for life and added, "but on her decease I give and devise the same to my surviving children 'to be divided equally between them.' It was held that the word 'surviving' related to the time of the wife's death. The opinion of the court is short, and is as follows:

"The testator devised his dwelling house to his wife for her life, and added, 'but on her decease I give and devise the same to my surviving children, to be divided equally between them.' Five children survived the testator, but only two survived the wife; and the question is whether the word 'surviving' relates to the time of the testator's death or to that of his wife's death. According to the natural use of language, it has reference to the latter event. It is placed in close connection with her decease. No reference is made to the time of his own death in any part of the will. The word 'surviving' would be unnecessary and meaningless if he meant to give the remainder of the estate to all of his children. The children surviving on her decease must be taken to be the devisees intended."

See also Denny v. Kettell, 135 Mass., 138.

In Mullarky v. Sullivan, 136 N. Y., 227, 231, it was held that the word "survivorship" applied to the death of the testator only in case of an absolute gift, and that it has no application to a case where the first devisee or legatee takes a life estate.

In Evans v. Godbold, 6 Richardson's Eq. Rep, 26-33, it is held that where there is a preceding life estate the word "survivor" refers to the period of distribution.

In Hill v. Rockingham, 45 N. H., 270-273, a bequest was made to the wife of $1000 in cash "the money to be laid out in good bank stock for her, to have the interest on the above for her life time,

after her decease to be equally divided among my living children'' It was held that the term "living children" was equivalent to the term "surviving children", and meant children surviving the life tenant and not the testator. The court reviews the law upon the subject and after showing that the American rule is the same as that laid down in Cripps v. Wolcott, concludes as follows, page 273,

"The result, then, of authority, in our opinion, is that if there be a bequest to one for life and then to the children of the testator or the survivor of them, those children will take who at the death of the tenant for life answer the description in the will, to the exclusion of the representatives of those who are then dead. This, we think, is the rule, and the bequest is in these terms and nothing more; subject, course, to be controlled by a manifestation in the will of a different intention."

For additional American authorities on this subject see Shoffert v. Gillan, Richardson's Eq. Rep., 83; Roundtree v. Roundtree, 26 So. Car., 450; Selman v. Robertson, 46 S. C., 3rd syllabus, 272, 273; VanTilburgh v. Hollinshed, 14 N. J. Eq., 33; Slack v. Bird, 23 N. J. Eq., 240; Dutton v. Pugh, 45 N. J. Eq., 426; Holcomb v. Lake, 24 N. J. Law Rep., 686; Siddell v. Wiells, 20 N. J. Law, 223.

Passing now from the decided cases to one of the leading authorities among text book writers we find in Jarman on Wills the following statement as to the authority of Cripps v. Walcott, and the soundness of the reasoning upon which it is based.

"Although this seems to have been at the time a very bold decision, involving as it did direct opposition to no less than nine cases (one decided by the house of lords) and although it is to be regretted, that the actual state of the authorities was not brought to the attention of the learned judge, yet the rule of construction which he propounded seems to be so reasonable and convenient for general application, that it is not surprising that subsequent judges have been favorably disposed to its adoption, as will appear in the cases about to be cited."

The author then proceeds to review at length the cases which have adopted the rule in Cripps v. Wolcott, and concludes as follows:

"The rule in Cripps v. Wolcott is not only settled, but is one which the court never seeks to evade by slight distinctions, but of course it must yield to a context clearly indicating a contrary intention."

3 Jarman on Wills (Randolph v. Talcott) page 589.

With this overwhelming current of English and American authority the decision of the supreme court of Ohio is in entire accord.

In Sinton v. Boyd, 19 Ohio St., 30, decided in 1870, the syllabus is as follows:

1. In the construction of wills, words of survivorship should be referred to the period appointed by the will for the payment or distribution of the subject matter of the gift, unless a contrary intention is evinced by the language of the will.

2. Where a testator gave all his estate to his wife for life, and directed that all remaining after her death should be divided, by his executors, equally amongst his children, or the survivors of them, and after his decease, one of the children died, before the death of the testator's widow, leaving a child: Held, that no interest vested in the deceased child under the will, and that the grandchild of the testator was not entitled to share in the estate, as one of the "children" or "survivors" to whom it was to be distributed.

The opinion of the court, after stating the question, says:

"The ancient holdings on this subject have been much modified by more recent decisions. Also the soundness of the distinction, taken between real and personal estate, has been questioned, until it has nearly or quite faded away. 2 Jar. on Wills (650); Hawkins' Treat. 262.

"The case of Young v. Robertson (8 Jurist. N. S. 825) decided in the House of Lords in 1862, is directly in point. It was a will of real and personal estate to trustees to account to the widow during her life, and after her death, to certain grand-nephews and nieces, or their survivors.

"In that case it was held, 'upon the authorities as well as upon principle', to be the rule, 'that where there is a clause of survivorship, prima facie survivorship means the time at which the property to be divided comes into enjoyment—that is to say, if there be no previous life estate, at the death of the testator; if there be a previous life estate, then at the termination of that life estate: or (as the rule is more briefly stated by the Lord Chancellor) that words of survivorship should be referred to the period 'for the payment or distribution of the subject matter of the gift'. This is declared by him to be 'the rule that is now finally established' in England.

"This undoubtedly is the general rule recognized in this country, subject, of course, to such modifications as the paramount rule, giving effect to the intention of the testator, may require.

"We think the general rule is the law applicable to this case, and that it is in harmony with the obvious purpose and intent of the testator, as gathered from the will."

The rule of construction then being that where a preceding estate exists, the words "surviving children" mean children surviving the owner of the preceding estate; and the rule being "one which the court never seeks to evade by slight distinction", and which yields only to "a context clearly indicating a contrary inten

tion'', and bearing in mind the internal evidences in the will to which I have referred and which are confirmatory of this construction, I proceed to examine the grounds upon which the defendants in error rely to overthrow this construction by showing that the intention of the testator was ''clearly'' in conflict with it. It is not sufficient for the defendants to raise a doubt as to the correctness of this construction of the will. The burden of proof is upon them, and they must sustain it, not merely by a preponderance of probabilities as to the intention of the testator, but by such weight as to ''clearly'' indicate a different intention.

Their principal contentions are that this construction violates the rule, (1) that the law favors vested estates, and (2) that the law disfavors intestacy; and their minor contentions are (1) that the words ''revert back'', and (2) that the circumstance that this construction would give Montgomery what has been called a double portion under the will, militate against this construction.

It is admitted that one of the rules of construction of wills is that the law favors the vesting of estates, and that such rule prevails in Ohio. Linton v. Laycock, 33 Ohio St., 128. But such rule is not a iron clad one and yields, as all other rules of construction, to the controlling principle of construction that the intention of the testator must always prevail. It is simply one of the numerous rules of construction which are used to assist courts in construing equivocal words. It is not a club used by courts to destroy contingent remainders where their creation by a fair construction of the will seems to have been the intention oaf the testator.

The best illustration in Ohio of the truth of what has just been said is found in the case of Hamilton v. Rodgers, 38 Ohio St., 255 In that case the language of the testator was so ''vague and uncertain'' that ''no thoroughly satisfactory conclusion'' could ''be drawn' from it, yet the court construed the will as creating a contingent remainder. The statement of the court that the meaning of the testator was doubtful appears from the following citation from that opinion:

''The only words of gift in the will are to be found in the devise of the whole estate to trustees, and in the direction to distribute the estate, after the determination of the particular estates and the final cessation of the annuities, among persons, some of whom, perhaps, were yet to be born. Color is given to a contrary construction by the provision directing the trustees to make certain payments to, or provision for the minor sons, when they should become of age, to be thereafter charged against their distributive shares; but, taking the will as a whole, we are persuaded that the real intention of the testator was that no estate should vest in any of the objects of his bounty until the

time for distribution should arrive, and then in those person only who should answer the description at that time. Speaking for myself only I wish to say that it is after much hesitation, and still not without some embarrassing doubts, that I have arrived at this conclusion. These doubts arise from the vague and uncertain language in which the intention of the testator is expressed, and from which no thoroughly satisfactory conclusion can be drawn.''

In declining to apply the rule that the law favors vested estates in the construction of this will of doubtful import, the court says:

''Although conceding that in the interpretation of wills courts in general favor that construction under which estates will vest at the time of testator's death, yet this, like every other rule of construction, will be controlled by the intention of the testator as gathered from the whole will. As was said by Scott, J., in Richey v. Johnson, 30 Ohio St., 288-292, 'we are to read the whole will and ascertain not only what the testator has said, but what he has forborne to say; and the construction given to any part of the will should conform to its general scope and purpose as collected from the whole document'.''

See also Gilpin v. Williams, 17 Ohio St., 396; Richey v. Johnson, 30 Ohio St., 288.

In Denny v. Kettell. 135 Mass. 139, the court declared that:

''The rule that the law leans towards vested remainders always yields when a contrary intention of the testator is to be gathered from the fair construction of the whole will; and where the question is to what period words of survivorship shall be referred, it is often more reasonable to suppose that the testator meant the period of distribution. even where real estate alone is involved.''

Another rule of construction relied upon by the defendants in error is that the construction for which plaintiffs in error contend makes the testator die intestate as to this property in case no children of the testator shall survive Jane Richardson.

I concede, of course, the rule that a testator is presumed not to die intestate; but such rule is a mere presumption used to assist the court in construing equivocal words. Like the rule just examined, it yields to the intention of the testator gathered from a fair construction of the will as a whole.

But the effect of this rule invoked by the defendants in error is neutralized by another which conflicts with it and which is applicable to this will, viz.: that ''where the meaning of a devise is uncertain, the law adopts the principles of the intestate law; for whoever claims against the law of descent must show a satisfactory written title ''Lipman's Appeal, 30 Pa. 188; France's Appeal 75 Pa. St., 220; Bowker v. Bowker, 148 Mass. 198; And in Bain v. Wick, 19 Ohio, 328, the court declared that

[COPYRIGHT, 1901, BY CARL G. JAHN.]

where the language of a residuary clause of a will, will admit of a limited application, as well as one of a more general character, a court would give it the construction most favorable to the heir at law. See also Crane v. Doty, 1 Ohio St., 283, and Mathews v. Krisher, 59 Ohio St., 574, in which cases it is said that the generally recognized rule is that the heir at law can be disinherited only by a devise of the property to another.

The construction contended for by plaintiffs in error is one that vests this property in all the heirs of the testator, while the contruction of the defendants in error excludes the representative of one of the daughters of the testator, viz; Mrs. Montgomery. The former construction is therefore to be preferred.

It is further claimed that the words "shall revert back" indicate that the testator had in mind children surviving his death.

This contention assumes either (1) that the estate was in those children who survived the testator by virtue of a vested remainder under the will; or, (2) that it would descend to them in case no will had been made. But the first assumption begs the very question at issue. It asserts that a vested remainder is devised to the children who survived the testator. But it is as impossible to prove the truth of a proposition by merely assuming it to be true, as it is for a man to lift himself by pulling on his own boot-straps.

The second assumption, that if it were not for the will the property would revert to the children surviving the testator, is not well founded, because if there were no will the property would descend not alone to the children who survived the testator, but also to the heirs of those children who had died before the testator, and would include Clark B. Montgomery, the son of a daughter of the testator who had pre-deceased him.

In Roundtree v. Roundtree, 26 So. Car. 450, in which case the words "revert back" were used under circumstances in many respects similar to those in the present case, the court said:

"There is nothing whatever to show that after the testator's mind was thrown forward to a future and indefinite time for the purpose of directing what was to be done with his property at that time, it reverted back to the condition of things existing at the time he executed his will, or at the time of his death, for the purpose of designating the persons who were to share in such future division. * * * On the contrary, however, his intention being that this division was to be made at a future unascertained period, not amongst all his children, as is conclusively shown by the qualifying word 'surviving'; and being unable to more specifically designate the objects of his bounty in such division, he employs the words found in the will."

The phrase "shall revert back to" is used as equivalent to "shall go to" or "shall vest in." It is not a happy selection of language, and if it cannot be used to fortify the contention of plaintiff in error, it is equally true that it cannot be used to strengthen that of the defendants in error.

It is also claimed that because Clark Bates Montgomery is by clause 6 given a promissory note for $12,000, he must therefore be excluded from any other participation in the testator's estate, otherwise under the will he would receive a double portion.

The will, as has been clearly shown, cannot be said to undertake to make an equal division of the estate.

The double portion argument, too, ought to exclude Joseph Bates, William Bates and Henry M. Bates, because he gives to each of them a tract of forty acres of land.

The reasons advanced by those who contend that the words "my surviving children" should be construed as meaning children surviving the testator, in my opinion fail of sufficient force to overthrow the construction which the settled rule of Cripps v. Wolcott imposes upon them, reinforced as such construction is by those other provisions found in the will which tend strongly, if not conlusively, to show that such construction properly expresses the intention of the testator.

Under the construction which I give to the words "my surviving children", an estate tail was devised to Jane Richardson, but if she died without issue of her body, the estate was to pass to children of the testator surviving her. The reversion in the estate passed to the heirs upon the death of the testator, but the heirs held the reversion subject to be divested of it by Jane Richardson dying with issue of here body or with children of the testator surviving her, an event which it is now known can never happen. The reversion which was descendible to the heirs was assignable by them, and as the fathers of Sarah J Bogen, Howard Bates and Laura V. Johnson assigned their interests, which have been conveyed to the Stock Yards Company, they can claim no interest in the reversion. But as the one-seventh interest in the reversion descended to Clark Montgomery, and as he has never conveyed it away, he is still the owner of the same.

I am therefore of the opinion that the judgment of the court in special term, so far as Clark B. Montgomery is concerned, should be reversed, and that this court should enter such judgment as should have been entered in special term.

Jelke, J.

I concur in the conclusion of the court for the reasons given in the second half of Judge Smith's opinion wherein he follows what seems to me to be an established rule of legal construction.